# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, J. WILLIAM BOOKWALTER, III, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 12-145 |
| v. | ) ) | Judge Cathy Bissoon |
| UPMC, *et al.*, | ) ) ) | |
| Defendants. | ) | |

## ORDER

For the reasons that follow, Defendants' Motion to Dismiss (Doc. 88) will be granted, and Plaintiffs will be afforded an opportunity to amend the complaint.

Counsel are familiar with the factual averments and legal issues presented, and the Court writes for their benefit only. Plaintiffs have initiated this *qui tam* action against Defendants under the False Claims Act ("FCA"), and the only remaining theories are that Defendants violated the Anti-Kickback Statute ("AKS") and the Stark Law. *See generally* Pls.' Opp'n (Doc. 91) at 1. Other allegations have been released pursuant to settlement, *see id.* at 1, and Plaintiffs have disavowed the notion that "specific claims for payment are false because the underlying services were not medically necessary." *Id.* at 26.

In sum, Plaintiffs challenge Defendants' physician-compensation system, which is based on the doctors' "wRVU" production. "The more complex [a medical] procedure, the greater [the] number of wRVUs . . . assigned." Am. Compl. (Doc. 31) at ¶ 79. Pursuant to the physicians' employment contracts, each doctor is required to generate a minimum number of wRVUs per calendar year in order to earn base compensation. *Id.* at ¶ 104. Once the minimum

is achieved, the doctor receives "bonus pay," at a rate of $45 per wRVU generated, even though the federal healthcare program(s) compensate UPMC at "a lower rate of approximately $35 per wRVU." *Id.* at ¶ 105. Plaintiffs contend that this violates the AKS and Stark Law, which prohibit certain self-interested referral and ownership arrangements, because the wRVU compensation system encourages physicians to "perform[] medically unnecessary and/or [unnecessarily] complex surgeries," thereby driving up their wRVUs, and, consequently, their personal remuneration. *See* Pls.' Opp'n (Doc. 91) at 7.

Defendants' Motion challenges Plaintiffs' Amended Complaint on a number of different grounds, most of which center on the "plausibility" standard under *Iqbal/Twombly*, and the requirement that FCA allegations be plead with specificity under Federal Rule 9(b). *See generally* Defs.' Br. (Doc. 89) at 12-25. The Court agrees with Defendants that Plaintiffs' allegations, as currently plead, fail under the plausibility and Rule 9(b) standards; their Motion will be granted; and their analyses are incorporated by reference herein.

Plaintiffs urge, however, that if Defendants' Motion is granted, they be afforded an opportunity to amend their pleadings in an attempt to state legally-viable claims. Pls.' Opp'n (Doc. 91) at 26-27. While the Court has strong doubts regarding their ability to do so, it will grant them one last, best chance to plead legally cognizable claims. In addition to Defendants' arguments, Plaintiffs also must be prepared to address the following.

Analyzing Plaintiffs' current pleadings is particularly difficult for two reasons: (1) the Amended Complaint contains averments regarding claims that since have been settled; and (2), Plaintiffs expressly have disavowed the notion that false claims were submitted because they were not "medically necessary." *See* discussions *supra*. As to the settled claims, they correspond to the only allegations in the Amended Complaint that approach the level of

specificity contemplated under Rule 9(b). *See* Foglia v. Renal Ventures Mgmt., LLC, 754 F.3d 153, 156 (3d Cir. 2014) (Rule 9(b) requires a plaintiff to allege "particular details of a scheme to submit false claims[,] paired with reliable indicia that lead to a strong inference that claims were actually submitted") (citation to quoted source omitted); *compare* Stipulated Order of Dismissal (Doc. 78) (addressing dismissal of claims related to billing of assisting-physician services, services related to "residents, fellows and physician assistants," and "multi-level laminectomies" performed "on fewer levels than reflected" in claims for payment) *with* Am. Compl. at ¶¶ 161-175, 176-203, 204-210 (providing greater specificity regarding these theories than as relates to Plaintiffs' physician-compensation theory).

Turning to "medical necessity," it is difficult to reconcile Plaintiffs' disavowal of such claims with their insistence that Defendants' compensation system encourages and/or induces unlawful referrals under the AKS and Stark Law. This is so because, in order to establish that additional (or more complex) surgeries were caused to be undertaken, by seemingly-inevitable implication, *they must show that a given procedure would fail the "medical necessity" standard*. *See* Pls.' Opp'n Br. (Doc. 91) at 7 (physicians inflated their wRVUs by "performing medically unnecessary and/or more complex surgeries when simpler and safer procedures were the standard of care"); *see also* Am. Compl. (Doc. 31) at ¶¶ 53, 67, 73 & 75 (emphasizing "medical necessity" standard, as applied under each federal healthcare program, including Medicare, Medicaid, TRICARE/CHAMPUS and FEHBP).

These conclusions notwithstanding, Plaintiffs posits that, while they expressly disavow "medical necessity" averments, "[t]his does not mean that evidence of the performance of medically unnecessary procedures is irrelevant" to their remaining claims, and they "fully intend to pursue such evidence in discovery." *See* Pls.' Opp'n (Doc. 91) at 26 n.11. The Court does not

3

believe, however, that Plaintiffs can "have it both ways." Plaintiffs cannot properly be permitted to engage in a fishing-expedition to seek out claims whose medical necessity may be questioned, while at the same time eschewing "medical necessity" averments to avoid the rigorous standards under Rule 9(b).

Furthermore, Plaintiffs must be prepared to offer more specific and plausible allegations in support of their AKS and Stark Law claims should they wish to avoid Defendants' arguments regarding the application of seemingly obvious exceptions built into the statutory framework. *See generally* Defs.' Br. (Doc. 89) at 12-25. While Plaintiffs retort that Defendants carry the burden of proving the exceptions are satisfied, and/or that such matters cannot properly be resolved at the 12(b)(b) stage, the lack of plausible and sufficiently-specific allegations of liability make their objections ring hollow. In the Amended Complaint, Plaintiffs recount page-after-page of boilerplate standards regarding the statutory and regulatory schemes, yet they offer only bald conclusions that "the [contracting] parties did not satisfy any exception[s]." *Compare, e.g.*, Am. Compl. (Doc. 31) at ¶¶ 81-95 (recounting standards under Stark Law, including detailed recitation of exceptions for "bona fide employment relationships," "personal service arrangements," "fair market value arrangements" and "indirect compensation relationships") *with id.* at ¶ 152 (flatly stating that the exceptions do not apply).[1]

---

[1] The cases relied upon most heavily by Plaintiffs' counsel address scenarios involving exclusivity-agreements entered between providers and hospitals, *i.e.*, the providers could only refer patients to the medical facility in question, but they were assured to be the provider for any such services undertaken. *See, e.g.*, Kosenske v. Carlisle HMA, Inc., 554 F.3d 88, 91 (3d Cir. 2009) *and* U.S. v. Millennium Radiology, Inc., 2014 WL 4908275, *1 (S.D. Ohio Sept. 30, 2014). While by no means is this a requirement for stating viable claim(s) under the AKS and/or Stark Law, the aforementioned decisions appear readily distinguishable from the legal theory in this case. Here, there is no suggestion that Defendants' physicians funneled referrals to a

(continued on next page...)

In addition, Plaintiffs' averments fail to offer a meaningful distinction between purportedly-unlawful claims, submitted pursuant to the "standard" compensation agreements of physicians targeted in the Amended Complaint, and the presumably-lawful claims submitted pursuant to *the Realtor-physician(s)' own compensation agreements*. See Defs.' Br. (Doc. 89) at 17.

Finally, even assuming Plaintiffs eventually do assert sufficiently specific and plausible averments in support of their AKS and Stark Law claims, the Court has no reason to believe that Defendants' arguments regarding the statutory exceptions could not properly be converted to summary judgment. The contractual dealings and provisions in question would, presumably, speak for themselves, and the Court has difficulty imagining why, and what, discovery would be necessary for Plaintiffs properly to resist. Should such a conversion be requested, *and* should Plaintiffs persuade the Court that any modicum of discovery is appropriate (and cannot be avoided by way of a voluntary informational exchange), the parties may rest assured that any discovery granted would be narrowly limited, and expedited, so that the Court promptly may resolve the threshold issues.[2]

---

particular facility; rather, the physicians operated under standard physician contracts, and Plaintiffs contend that, in order to receive bonus compensation under those agreements, Defendants encouraged medically-unnecessary procedures to increase their wRVU ratings. Other than reciting the overarching legal standards, Plaintiffs' cases do not offer much in the way of meaningful comparison. Indeed, the only precedent broaching the instant scenario runs decidedly in Defendants' favor. See Bingham v. BayCare Health Sys., 2016 WL 8739056, *5 (M.D. Fla. Dec. 16, 2016) (granting summary judgment in favor of defendants on Stark Law claim because, among other things, compensation for the physicians was "comprised of a base salary and the physician[s'] productivity using . . . wRVUs," "neither of which [we]re based on referrals") (emphasis added); *cf. also generally* discussion *infra* (contemplating potential conversion of Defendants' arguments to summary judgment).

[2] Plaintiffs' current objection to Defendants' reliance on materials outside the pleadings likewise could be resolved through conversion to summary judgment. See Pl.'s Opp'n Br. (Doc. 91) at 1 n.1. To the extent that any such materials might shed light on the legal issues presented,

(continued on next page...)

Consistent with the above, Defendants' Motion to Dismiss (**Doc. 88**) is **GRANTED**, and Plaintiffs' deadline for filing a curative amendment is **July 10, 2017**. No further opportunity for amendment will be afforded, and Plaintiffs must be prepared to make last, best efforts to state viable claims. *See generally* Renze v. Longo, 2017 WL 782893, *4 (W.D. Pa. Mar. 1, 2017) ("[it] would be inequitable to require [a d]efendant, who already once has exhaustively and successfully defended [the plaintiff's] grievances, to respond to a continuous stream of . . . attempted amendments") (citation to quoted source omitted). In amending, Plaintiffs shall account not only for the discussions herein, but also for Defendants' remaining arguments for dismissal. In addition, Plaintiffs' amended pleadings shall omit allegations in support of claims that have settled, as well as those made in support of "medical necessity," as disclaimed by their counsel. Finally, and although it probably goes without saying, the Court's grant of leave to amend does not extend an invitation for Plaintiffs to espouse new theories of putative-liability. *See* In re Chemed Corp., 2017 WL 1712530, *13 (D. Del. Apr. 25, 2017) (when a court grants leave for curative amendment, it properly may dismiss proposed amendments that exceed the bounds of what was considered) (collecting cases).

Once Plaintiffs have filed a second amended complaint, Defendants shall plead or otherwise respond by **July 28, 2017**.

---

and in the absence of specific objections that only may be remedied through discovery, the Court believes that informational-barriers should not be constructed to avoid a reasoned decision. As should be evident, moreover, the Court will have a watchful eye toward ensuring that discovery, if any, will not degenerate into a fishing-expedition.

IT IS SO ORDERED.[3]

June 21, 2017               s\Cathy Bissoon
                            Cathy Bissoon
                            United States District Judge

cc (via ECF email notification):

All Counsel of Record

---

[3] In raising the prospect of a conversion to summary judgment, the Court does not mean to suggest that Defendants cannot properly establish their entitlement to dismissal under Rule 12(b). The point is that, should additional information prove useful, or should conversion be appropriate to reach obviously-implicated statutory exceptions, the Court will <u>not</u> countenance broad and unlimited discovery regarding matters unrelated.